### PEOPLE *v.* GENGELS.

1. WITNESSES—IMPEACHMENT MAY NOT BE BASED ON ANSWERS ON CROSS-EXAMINATION UPON COLLATERAL MATTERS.

   A witness may not be impeached on his answers to questions on cross-examination upon collateral matters.

2. CRIMINAL LAW—EVIDENCE OF OTHER CRIMES—WHEN ADMISSIBLE —GUILTY KNOWLEDGE—CRIMINAL INTENT.

   As a general rule, upon a trial for felony the prosecution may not introduce evidence tending to prove that the

---

On evidence of other crimes in prosecution for rape, see notes in 62 L. R. A. 314, 322, 329; 48 L. R. A. (N. S.) 236.

On effect of defendant's mistake as to age of girl, under statute denouncing sexual offenses against female under specified age, see note in 25 L. R. A. (N. S.) 661.

accused has been guilty of other distinct and independent crimes for the purpose of proving that he committed the offense charged, but an exception is recognized in that class of crimes where guilt depends upon the intent, guilty knowledge, and purpose with which the act charged is done, when evidence as to some overt act with intent to commit some felony not actually accomplished or a series of connected frauds, forgeries, passing counterfeit money, etc., is competent to establish guilty knowledge and criminal intent.

3. RAPE—STATUTORY RAPE—INTENT.
   In a prosecution for statutory rape, proof of the intent goes with proof of the act of sexual intercourse with a girl under the age of consent. .

4. SAME—CONSENT NO DEFENSE.
   Proof of consent is no defense, where the girl is under the statutory age, since she is legally incapable of consenting.

5. SAME—BELIEF AS TO AGE OF CONSENT NO DEFENSE.
   Nor is it any defense that the accused believed from the statement of the girl or others that she had reached the age of consent.

6. SAME—PROOF OF OTHER ACTS BETWEEN SAME PARTIES ADMISSIBLE.
   In a prosecution for statutory rape, proof of other acts of intercourse between the prosecutrix and accused is permissible only for the purpose of showing opportunity, disposition of the parties, and intimate relations tending to break down self-respect and modesty.

7. SAME—EVIDENCE AS TO OTHER OFFENSE WITH ANOTHER PARTY INADMISSIBLE—IMPEACHMENT.
   It was error for the prosecutor to assert, and attempt to prove, another rape by accused upon another girl at a different time, having no connection with the crime charged, claiming that it was admissible by way of impeachment.

Error to Kent; Perkins (Willis B.), J.    Submitted April 14, 1922.    (Docket No. 119.)    Decided June 5, 1922.

Adolph Gengels was convicted of statutory rape, and

sentenced to imprisonment for not less than 2 nor more than 5 years in the house of correction at Ionia. Reversed.

*John M. Dunham,* for appellant.

*Cornelius Hoffius,* Prosecuting Attorney (*Fred P. Geib,* of counsel), for the people.

STEERE, J. Defendant was tried and convicted in the circuit court of Kent county of the crime of statutory rape under an information containing one count which charged him in proper form with having, on May 24, 1921, assaulted Mildred Sayles, a female child under 16 years of age and "then and there feloniously did unlawfully and carnally know and abuse, contrary to the form of the statute in such case made and provided," etc. It was shown by her own and her father's testimony that at the time of the offense as charged Mildred Sayles was under 16 years of age and attending public school. She was a large girl, weighing about 135 pounds, who had been employed at different times as an usher at the Empress and other theaters in the city of Grand Rapids, where she had given her age as 16 years for the purpose of securing employment.

Defendant was a Lithuanian 24 years of age and employed as a cabinet maker in Grand Rapids. He had bought a second-hand automobile with which he admitted taking the girl riding at various times, having formed her acquaintance on the street, denied having sexual intercourse with her on the occasion charged or at any other time, and claimed that he cared for her a great deal, treated her as his sweetheart, and "acted like a gentleman."

There were no other witnesses to what occurred between them on the night in question. She testified positively to his having sexual intercourse with her.

He positively denied it.   Much of the record is composed of his lengthy cross-examination and many of defendant's 26 assignments of error are directed to that portion of the trial, particularly to claimed prejudicial conduct and comment of the prosecuting attorney in that connection, and attempts to collaterally impeach defendant's answers on cross-examination as to his commission of other offenses of like nature.

Defendant's cross-examination disclosed that he had on various occasions when out with a boon companion driving in his automobile around the streets of Grand Rapids picked up and taken riding with them girls willing to accept their invitations and companionship.   He admitted acquaintance formed in that way with several girls they had first met upon the street and taken riding.   Pressed as to his conduct with them he admitted congenial associations but positively denied sexual intercourse or any improper conduct with them.   During the course of his protracted cross-examination the prosecuting attorney pointed out several young women or girls he had brought into court, one with a baby in her arms, and interrogated defendant in regard to them.   Defendant admitted knowing them and to having taken them riding in his car, but insisted in denial of accusing questions that his conduct when with them had always been honorable, and he had acted like a gentleman.   Taking as his text defendant's claim that he "acted like a gentleman," the prosecuting attorney theatrically featured his cross-examination against objection of defendant's counsel by calling up and pointing out the girls he had arrayed in court and catechizing defendant as to his relations with them in part as follows:

"You said every girl you took out you acted as a gentleman with them?

"A. Yes, sir.

"Q. You are swearing to that, are you?

"*A.* Yes, sir.

"*Q.* Mabel (addressing Mabel Zevalkink), who is this girl standing up (referring to Mabel Zevalkink)?

"*A.* Her name is Mabel.   I don't know her last name.

"*Q.* Has she ever been in your machine?

"*A.* Yes, sir.

"*Q.* Ever had intercourse with her?

"*A.* No, sir.

"*Q.* How often has she been in your machine?

"*A.* About three times.   *   *   *

"*Mr. D——.*   I want to object, if the court please, to this line of cross-examination.   I don't think it is competent.   It is prejudicial.   He is on trial for an act of intercourse on the 24th of May.

"*Mr. H——.*   He, himself, on direct-examination, your honor, said that every girl he took out he acted as a gentleman.   *   *   *

"*The Court*—I think that is proper on cross-examination.

"*Q.* Josephine DeWinter (addressing a girl sitting in the court room), will you please stand up?   (Whereupon Josephine DeWinter stood up.)   Do you know that girl (referring to Josephine De Winter)?

"*A.* Yes, sir.

"*Q.* She has been in your machine?

"*A.* Yes, sir.

"*Q.* How often?

"*A.* Not much.

"*Q.* How?

"*A.* Not much, about 3 or 4 times.

"*Q.* Where did you take her to?

"*A.* Around the city.

"*Q.* Did you ever take her out in the country?

"*A.* No, sir.

"*Q.* What time of the day or night?

"*A.* Early.

"*Q.* What time I asked you?

"*A.* About 9 or 10 o'clock.   *   *   *

"*Q.* Did you have intercourse with Josephine?

"*A.* No, sir.

"*Q.* You had sexual intercourse with her?

"*A.* No, sir.

"*Q.* You had sexual intercourse with Mabel Zevalkink and she had a baby by you?

"*Mr. D—*.    That is improper.    If he did he would have been arrested a long time ago.

"*Mr. H—*.    Not at all.    I will put her on the stand.

"*Q.* Isn't the baby she has now (referring to baby in Josephine DeWinter's arms) a baby born to her by you, the girl you had out 3 or 4 times, didn't you?

"*A.* 3 or 4 times.

"*Mr. D—*.    I object to all this line of cross-examination.    *   *   *

"*Q.* Did you pick up the other girl that way, Frances DeGraff?    Do you know her?    She has been in your car?

"*A.* Yes, sir.

"*Q.* You picked her up that way?

"*A.* Yes, sir.

"*Q.* You had intercourse with her, too, didn't you?

"*Mr. D—*.    I object to that.

"*The Court.*    He can claim his constitutional privilege.

"*A.* She rode in my car.

"*Q.* How often had she rode in your car?

"*A.* 4 or 5 times.    *   *   *

"*Q.* Isn't that what you did every night, right along, pick up girls on the street?

"*A.* Impossible.    *   *   *

"*Q.* You mean when you made the answer 'impossible,' you mean to say perhaps it was impossible to have intercourse every night?

"*A.* No, sir.

"*Mr. D—*.    That question is objected to.    It is prejudicial, put in purely to prejudice the jury.

"*Mr. H—*.    Oh, no, he has prejudiced himself.    *   *   *

"*Q.* Have you heard your machine called the 'whorehouse?'

"*A.* No, sir, no such thing in the world.    I never did.

"*Q.* Are there any of these girls Lithuanians?

"*A.* No, I don't know.    *   *   *

"*Q.* If you were honorable with them why didn't you stick to one girl?

"*A.* I tried, that was impossible.

"*Q.* That is impossible, too.    What is impossible about that?

"*A.* I tried to stick with Mildred.

"*Q.* School girl, school girl?

"*A.* She told me she was 18 years old  *  *  *

"*Q.* Did you want to have intercourse with them?

"*A.* No, sir.

"*Q.* Why not?

"*A.* Because I didn't care to, all I wanted was just to ride around, and pass the time away after work.

"*Q.* Why didn't you ride around with some men?

"*A.* I did.

"*Q.* Why didn't you let the little girls alone?

"*A.* Couldn't a fellow go out with a girl once in a while?

"*Q.* Yes, if they do it clean."

Having concluded his lengthy cross-examination of defendant by a series of accusing and assertive leading questions portraying as asked dissolute and criminal relations of like nature with other girls, the prosecuting attorney called three girls he had in the court room and pursued the subject further with them. The testimony of two of them produced nothing by way of rebuttal of importance. Both testified that they had been taken riding by defendant in his automobile, that they had previously been properly introduced to him, one by her aunt, and neither gave evidence of any immoral conduct. The third was Mabel Zevalkink, as to whom the prosecuting attorney had asked defendant if he had sexual intercourse with her and asserted he would "put her on the stand." She was a married woman carrying an infant born in lawful wedlock. She testified that she was married December 27, 1920, and her baby was born on the 24th of the following June, and that in the summer of 1920 she had on different occasions gone out with defendant and also with other boys. When the prosecuting attorney asked her if "Gengels has had intercourse with you" the court sustained the objection of defendant's counsel that it was a prejudicial effort of the prosecution to impeach defendant on a collateral matter. The prosecuting attorney however insisted

and argued in the presence of the jury that it was permissible in rebuttal of defendant's testimony that he was a gentleman with the girls he took out, and also because the offense charged required intent, for which reasons the prosecution was entitled to show his conduct with other girls as well as to test his credibility. The ruling being adhered to he asked "whether or not he told you—I ask this question for impeachment purposes and laying the foundation for it, if he had been in trouble before and if he had got out of it." Objection to this was overruled, but on her answering, "He didn't tell me, Andy Putt said he did," the answer was stricken out. Amongst others the following questions and answers were permitted:

"*Q.* Is that your baby?   (Indicating.)
"*A.* Yes, sir.
"*Q.* Did Gengels try to get you to go to a west side midwife to have an operation performed?
"*A.* Yes.  *  *  *
"*Q.* To a married man's wife, that would be a midwife, did you go?
"*A.* No.
"*Q.* And as a result of that, that is the baby?
"*A.* Yes.
"*Mr. D—.* I want the record to show this baby talked about so much, was brought into the court room so the jury could see it, all of it being purely prejudicial.
"*Mr. H—.* All right, I will go further.
"*Q.* Who is the father of your baby?"

Objection to this question being sustained, the subject was approached as follows:

"Did he act as a gentleman with you when he was with you?
"*A.* No, sir.
"*Q.* To what extent did he go?"

This question was repeated after suggestion by the court that there were varying degrees of gentlemanliness, and ruled out.

Commenting on this ruling counsel for the prosecution said:

"It happens to be on the very subject-matter, which, of course, this trial is about.   It also—well, it attacks his credibility and as this is on another subject-matter, the court would permit it because it is on the same subject-matter, but tends to show another offense, then, it is excluded.   Just as I say, I don't do it for the purpose of showing another offense of a similar kind, but to attack his credibility as a witness that he himself opened the door to."

While within broad limits the latitude of a cross-examination is within the trial court's discretion the course pursued here makes well in point the following reflection in 1 Wharton's Criminal Evidence (10th Ed.), § 52:

"Judgments of conviction have frequently been set aside because of the conduct of counsel for the prosecution in stating and insinuating other offenses than the one for which the accused was on trial, either in argument, or by repeatedly asking rejected questions and commenting on what the answers would have been if allowed."

That a witness cannot be impeached on his answers to questions on cross-examination upon collateral matters is elementary.   It is also a well established general rule that upon a trial for felony the prosecution may not introduce evidence tending to prove that accused has been guilty of other distinct and independent crimes for the purpose of proving he committed the offense charged.   An exception to the rule recognized in this and many other jurisdictions is in that class of crimes where guilt depends upon the intent, guilty knowledge and purpose with which the act charged is done, as some overt act with intent to commit some felony not actually accomplished, or where a series of connected frauds, forgeries, passing counterfeit money, etc., is held competent as tending to estab-

lish guilty knowledge and criminal intent. But in the crime charged here proof of the intent goes with proof of the act of sexual intercourse with a girl under the age of consent. It is not necessary for the prosecution to prove want of consent. Proof of consent is no defense, for a female child under the statutory age is legally incapable of consenting. Neither is it any defense that the accused believed from the statement of his victim or others that she had reached the age of consent. 33 Cyc. p. 1438, and cases cited.

In cases involving statutory rape, a qualified exception to the general rule only permits proof of intercourse between the prosecutrix and accused for the purpose of showing opportunity, disposition of the parties and intimate relations tending to break down self-respect and modesty. *People* v. *Abbott,* 97 Mich. 484 (37 Am. St. Rep. 360); *People* v. *Williams,* 133 Cal. 168 (65 Pac. 323); *State* v. *Lancaster,* 10 Idaho, 410 (78 Pac. 1081); *State* v. *Trusty,* 122 Iowa, 82 (97 N. W. 989). In the instant case the prosecuting attorney asserted and spectacularly attempted to directly prove, "On the very subject-matter, of course, this trial is about," another rape committed upon another girl at a different time, having no connection with the crime charged, speciously insisting before the jury and attempting indirectly to prove by further suggestive questions the very subject-matter which the court had excluded, claiming that it was admissible by way of impeachment. The course pursued was prejudicial error.

The judgment is reversed and a new trial granted.

FELLOWS, C. J., and WIEST, MCDONALD, CLARK, BIRD, SHARPE, and MOORE, JJ., concurred.